Clifton MASON *v.* STATE of Arkansas

CR 03-1100 206 S.W.3d 869

Supreme Court of Arkansas
Opinion delivered April 14, 2005

[Rehearing denied May 19, 2005.]

*Cullen & Co., P.L.L.C.*, by: *Kami S. Wallace*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Valerie L. Kelly*, Ass't Att'y Gen., for appellee.

J IM HANNAH, Chief Justice. Clifton Mason appeals his convictions for first-degree terroristic threatening and first-degree battery by means of a firearm. Mason argues that there is insufficient evidence to sustain his conviction for terroristic threatening. Mason also asserts that this court must reverse his conviction for battery under collateral estoppel or the issue-preclusion arm of the doctrine of *res judicata* and Ark. Code Ann. § 5-1-113(2) (Repl. 1997) because his prior acquittal on a charge of possession of a firearm by certain persons prohibited the State from again litigating a crime requiring possession of a firearm.

We hold that there was substantial evidence in support of the conviction for terroristic threatening and affirm on that charge. With respect to battery by means of a firearm, the State argues that the elements in the earlier trial and the elements in this trial on the battery charge differ, precluding the application of collateral estoppel or issue preclusion. We hold that issue preclusion of *res judicata* and Ark. Code Ann. § 5-1-113(2) precluded the State from attempting to prove in the present trial that Mason possessed a firearm where an earlier jury decided that Mason did not possess a

firearm at the time the crimes were alleged to have occurred. We reverse and remand on this charge. Our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(b)(1) and (6) because this case involves issues of first impression and interpretation of an act of the General Assembly.

*Facts*

According to the testimony of Jackie Johnson, he and his wife, Latonia Johnson, were in their home February 6, 2002. They were up late cooking for expected company and playing cards. Both Jackie and Latonia testified that Diane Crutchfield came to their house between 12:30 a.m. and 1:00 a.m. on February 7, 2002. According to Jackie, Crutchfield came by because Crutchfield wanted company, and, according to Latonia, Crutchfield came by because she was scared and wanted the Johnsons to accompany her back to her house. Latonia also recounted that Crutchfield wanted to retrieve some money from her house and then return to the Johnson home. Both Jackie and Latonia testified that Mason had been living at Crutchfield's home for about a month at that point.

About 5:00 a.m., the Johnsons and Crutchfield took a cab to Crutchfield's house, but found all the doors locked when they arrived. Jackie and Latonia testified that Mason let them in the house by a side door, and Latonia testified that Crutchfield cussed at Mason and told him to go to a back room, which he did. Both Jackie and Latonia testified that the two of them and Crutchfield went to the den and stayed there for about half an hour. According to Latonia, she told Crutchfield to check on Mason because he was being too quiet. According to Jackie, Crutchfield went on her own to check on Mason. According to Jackie, Crutchfield asked him to accompany her, and he did. Jackie testified that when they got to the room, Mason asked, "Why you bitches back here?" Jackie further testified that Mason then became agitated and pulled a pistol.

Latonia testified that after Jackie and Crutchfield went to check on Mason, she heard a commotion, went back to the room, and saw Mason holding a gun. Jackie told the jury that at this point, Crutchfield turned and began to leave, and that he did the same, but that Mason shot him first in the wrist and then in the back as

he tried to get away. Latonia testified that she saw these events as well, and that after Jackie went outside, Mason followed him out onto the porch and was still shooting at him. Jackie recounted the same, testifying that Mason grazed his neck with a shot as he and Crutchfield ran across the yard.

According to Latonia, after shooting at Jackie, Mason came back inside, where Latonia was hiding in the dining room, and found her. Latonia told the jury that Mason was holding the gun up at her, and that she grabbed the barrel. Latonia testified that she held onto the barrel, throwing Mason on the dining table, where he said, "Oh bitch, get your ass on out. Come on, get on up out of here." Latonia stated that she continued to hold onto the barrel and pulled Mason out the back door, where she fell on the steps. She also testified that Mason hit her on the head with the gun. Latonia then stated that Jackie came back, and Mason said, "I'm fixing to kill you." Jackie testified that he heard Mason saying to Latonia, "I'm going to kill you, I'm going to kill you," and that Latonia was saying, "Please don't shoot me. Please don't shoot me." Marie Holmes, a neighbor, testified that she saw a man chasing a woman with a gun and heard him threaten to kill her. Both Jackie and Latonia testified that Mason then followed them outside for a time and had the pistol in his possession. The Johnsons testified that they then went inside a house and called 911.

Mason was accused of causing injuries to Jackie and Latonia. He was charged in Count I with battery in the first degree by means of a firearm for the injuries to Jackie, in Count II with battery in the first degree by means of a firearm for the injuries to Latonia, in Count III with possession of a firearm by certain persons, and in Count IV with terroristic threatening in the first degree. On May 10, 2002, Count III, the charge of possession of a firearm by certain persons was severed. On August 13, 2002, the State moved for a continuance to have sufficient time to obtain information on Mason's former out-of-state convictions; the motion was granted as to Counts I, II, and IV. This meant that Count III, possession of a firearm by certain persons, was tried first. That trial resulted in a not-guilty verdict. Based on this verdict, Mason moved on November 12, 2002, that Counts I, II, and IV be dismissed, based on collateral estoppel and Ark. Code Ann. § 5-1-113(2)(Repl. 1997). The motion was denied, and the circuit

court noted that the issue was subject to the "*Blockburger* test."[1] Count II was dismissed by the circuit court pursuant to Mason's motion for a directed verdict.

## Terroristic Threatening

■ Mason argues that there was insufficient evidence to support his conviction for terroristic threatening. The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Smith v. State*, 352 Ark. 92, 98 S.W.3d 433 (2003). Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* When a defendant challenges the sufficiency of the evidence convicting him, the evidence is viewed in the light most favorable to the State, and only evidence supporting the verdict will be considered. *Id.*

The evidence in the case before us showed that Mason came out of the back room of the house, and that everyone fled from him. Latonia engaged in a physical fight with Mason in which she was forced out the door and fell on the steps to the porch. During the course of this fight, Mason was reported to have said, "Oh bitch, get your ass on out. Come on, get on up out of here," as well as, "I'm fixing to kill you." Jackie testified that he heard Mason saying to Latonia, "I'm going to kill you, I'm going to kill you,"

---

[1] In *Cothren v. State*, 344 Ark. 697, 705, 42 S.W.3d 543 (2001), this court stated:

> In *Blockburger v. United States*, 284 U.S. 299 (1932), the U.S. Supreme Court held that the double jeopardy bar applies in the multiple punishment context where the two offenses for which the defendant is punished cannot survive the "same-elements" test. The same-elements test, commonly referred to as the "Blockburger" test, is as follows:
>
> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not .... [A] single act may be an offense against two statutes, and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

*Blockburger v. United States*, 284 U.S. at 304.

and that Latonia was pleading for her life. Also, the neighbor, Marie Holmes, testified that she saw Mason chasing a lady and heard him threaten to kill her.

■ A person commits first-degree terroristic threatening if, with the purpose of terrorizing another person, he or she threatens to cause death or serious physical injury or substantial property damage to another person. Ark. Code Ann. § 5-13-301(a)(1)(A)(Repl. 1997). *See also Proctor v. State*, 349 Ark. 648, 79 S.W.3d 270 (2002). Mason threatened to cause death and made the threat in the course of a physical attack on Latonia, Jackie, and Crutchfield. Thus, there was a threat, and, as required, it was communicated to the victim Latonia, in this case directly by Mason. *See Smith v. State*, 296 Ark. 451, 757 S.W.2d 554 (1988); *see also Knight v. State*, 25 Ark. App. 353, 758 S.W.2d 12 (1988). It also must be a threat intended to terrorize. *Id.*

■ Evidence that a person is in a fight, is being forced out of the house, is threatened with death, and pleads for her life constitutes substantial evidence in support of a conviction for first-degree terroristic threatening because there is substantial evidence that the necessary threat was made, as well as an intent that the victim be terrorized by the threat. *See Sanders v. State*, 326 Ark. 415, 932 S.W.2d 315 (1996). We affirm Mason's conviction and sentence for terroristic threatening.

### Former Decision on Possession of a Firearm by Certain Persons

Mason alleges that his conviction for battery in the first-degree by means of a firearm must be reversed based on *res judicata*, specifically under the collateral estoppel[2] or issue-preclusion facet of *res judicata*. Mason asserted that it was determined in his prior

---

[2] This court and other courts often use the term "estoppel" rather than "issue preclusion" in discussion of the doctrine of *res judicata*. This can be confusing, as noted in 50 C.J.S. *Judgment* § 700 (1997). The first inclusion of the term "collateral estoppel" in an opinion by this court discussing *res judicata* is *Narsi v. Narsi*, 233 Ark. 525, 345 S.W.2d 620 (1961), where the term appears in a quote from 27 C.J.S. *Divorce* § 174 (1959). The term next appears in *Fuller v. Fuller*, 240 Ark. 475, 400 S.W.2d 283 (1966), in a quote from Restatement of Judgments § 68 (1942). The term "collateral estoppel" first appears in the U.S. Reports in *Mercoid Corp. v. Mid-Continent Co.*, 320 U.S. 661 (1944), where the Court cites Scott, *Collateral Estoppel by Judgment*, 56 Harv. L.R. 1 (1942). Estoppel is an equitable doctrine based in reliance on another party's actions or representations. *See, e.g.*, In *Foote's Dixie Dandy, Inc. v. McHenry*, 270 Ark. 816, 607 S.W.2d 323 (1980). Issue-preclusion does not arise from

criminal trial for felon in possession of a firearm that he did not possess a firearm at the time of the events at issue in this case; and, therefore, the State may not again try to prove that he possessed a firearm.

In criminal cases, a bar to prosecution is most often based on double jeopardy principles. The application of principles of *res judicata* in criminal cases is less common. The application of *res judicata* has a confused and checkered history and merits a detailed discussion, because the principles of double jeopardy are sometimes confused with *res judicata* and improperly included in discussions of *res judicata*. We take this opportunity to clarify the application of *res judicata* in the criminal law.

■ "The concept of *res judicata* has two facets, one being issue preclusion and the other claim preclusion." *Carwell Elevator Co. v. Leather*, 352 Ark. 381, 388, 101 S.W.3d 211, 217 (2003). *See also Huffman v. Alderson*, 335 Ark. 411, 983 S.W.2d 899 (1998). The term *res judicata* has sometimes been used to refer only to claim preclusion;[3] however, issue and claim-preclusion are distinct legal concepts. *East Texas Motor Freight Lines, Inc. v. Freeman*, 289 Ark. 539, 713 S.W.2d 456 (1986). "Under claim-preclusion, a valid and final judgment rendered on the merits by a court of competent jurisdiction bars another action by the plaintiff or his privies against the defendant or his privies on the same claim." *Searcy v. Davenport*, 352 Ark. 307, 310, 100 S.W.3d 711, 713 (2003). Under issue preclusion, a decision by a court of competent jurisdiction on matters which were at issue, and which were directly and necessarily adjudicated, bars any further litigation on those issues by the plaintiff or his privies against the defendant or his privies on the same issue. *Linn v. Nationsbank*, 341 Ark. 57, 14 S.W.3d 500 (2000). Issue preclusion along with claim preclusion constitute the doctrine of *res judicata*. *Carwell, supra*; *Bailey v. Harris Brake Fire Prot. Dist.*, 287 Ark. 268, 697 S.W.2d 916 (1985).

---

equity. It is a plea in bar, which is an old term for a legal plea that the action is barred. *See, e.g., Flanagan v. Drainage Dist. No. 17*, 176 Ark. 31, 32, 2 S.W.2d 70 (1928). The issue of a bar might be thought of as collateral in the sense that suit is barred based on a reason unrelated to the issues raised in the complaint.

[3] *See, e.g., Fisher v. Jones*, 311 Ark. 450, 456, 844 S.W.2d 954 (1993); *Smith v. Roane*, 284 Ark. 568, 569, 683 S.W.2d 935 (1985). In *Toran v. Provident Life & Accident Ins. Co.*, 297 Ark. 415, 419, 764 S.W.2d 40 (1989), we went so far as to state that "*res judicata* and collateral estoppel are separate concepts."

■ The rationale for the doctrine of *res judicata* is the policy of the law to end litigation, once an issue or claim has been fully litigated. *East Texas Motor Freight, supra. Res judicata* is a common law doctrine. *Gideon v. Gideon*, 268 Ark. 873, 876, 596 S.W.2d 367 (1980). The concept of *res judicata* was developed in the common law of this court as well as in the federal courts. In *Ashe v. Swenson*, 397 U.S. 436 (1970), the federally developed "collateral estoppel" facet of *res judicata* was declared applicable to the States by way of the Fifth Amendment. This law was later codified as Ark. Code Ann. § 5-1-113(2) (Repl. 1997). *Journey v. State*, 261 Ark. 259, 547 S.W.2d 433 (1977). It was through the common law that the principles of collateral estoppel, made applicable to the States in *Ashe, supra,* were developed. Our own common law on *res judicata* remains viable and relevant. The common law is judicially created law that is developed on a case by case basis. *Lucas v. Handcock*, 266 Ark. 142, 583 S.W.2d 491 (1979). The common law is dynamic, allowing it to grow and tailor itself to changing needs within the doctrine of *stare decisis. Shannon v. Wilson*, 329 Ark. 143, 947 S.W.2d 349 (1997).

■ While the doctrine of *res judicata* is more often encountered in the context of civil litigation, it is a common-law doctrine that is as applicable in criminal law as it is in civil law. *State v. Thompson*, 343 Ark. 135, 34 S.W.3d 33 (2000); *Edwards v. State*, 328 Ark. 394, 943 S.W.2d 600, *cert. denied,* 522 U.S. 950 (1997) (quoting *Schiro v. Farley*, 510 U.S. 222, 232 (1994)). *Res judicata* means that "a thing or matter that has been definitely and finally settled and determined on its merits by the decision of a court of competent jurisdiction." *Hunt v. Perry*, 355 Ark. 303, 310, 138 S.W.3d 656, 659 (2003). "The Latin words, *res judicata,* literally translated into English mean 'a thing adjudged' and freely translated into English mean 'the matter has been decided.' " *Hastings v. Rose Courts*, 237 Ark. 426, 431, 373 S.W.2d 583, 586 (1963).

■ The doctrine of *res judicata* should not be confused with more familiar criminal doctrines based on double jeopardy. Both the doctrine of *res judicata* and the double-jeopardy doctrines of former acquittal or former conviction originate in the common law. The doctrines of former acquittal or former conviction are based on the idea that "no man shall be placed in peril of legal penalties more than once on the same accusation." *Lee v. State,* 26

Ark. 260, 264 (1870) (citing Wharton, *Criminal Law*, p. 574). The doctrine of *res judicata* is based on the principle that issues and claims properly decided ought not be decided again. *East Texas Motor Freight, supra.*

At common law, there were special pleas[4] in bar[5] of criminal prosecution that went to the "merits of the indictment, and give a reason why the prisoner ought not to answer it at all, not put himself upon his trial for the crime alleged." William Blackstone, 4 *Blackstone's Commentaries* Ch. 26, para. IV at p. 329 (2d ed. 1769). Two of these special pleas were *auterfoits acquit* and *auterfoits*[6] *convict*. Both were based "on the universal maxim of the common law of England,[7] that no man is to be brought in jeopardy of his life, more than once for the same offense." *Id.* at 329–30. The plea of *auterfoits acquit* is a plea in bar based on a prior acquittal for the crime charged. "And hence, it is allowed as a consequence, that when a man is fairly found not guilty upon any indictment, or other prosecution, he may plead such acquittal in bar of any subsequent accusation for the same crime." *Id.* at 329. The plea of *auterfoits convict* is a plea in bar based on "a former conviction for the same identical crime." *Id.* at 330. These principles of the common law were "borrowed" and placed in both the federal constitution and our own state constitution under the idea that no person should be subjected to prosecution for the same offense twice. *Lee,* 26 Ark. at 264. The plea of *auterfoits acquit* is noted in *Lee, supra,* and earlier in *Atkins v. State,* 16 Ark. 568 (1856). *See also Hammond v. State,* 173 Ark. 674, 293 S.W.2d 714 (1928).

 Like the doctrines of *auterfoits acquit* and *auterfoits convict* that are now contained in the constitutional protections against double jeopardy, the doctrine of *res judicata* also derives from a plea in bar at the common law. As Chief Justice DeGrey stated in the

---

[4] A special plea is a plea in bar as distinguished from a plea on the general issue, or in other words as distinguished from a plea in direct response to the allegations of the action. It is an affirmative plea barring the action. *See Black's Law Dictionary* 1131 (4th ed. 1951).

[5] A plea in bar is a plea that defeats an action absolutely and entirely. *See Black's Law Dictionary* 1130 (4th ed. 1951).

[6] Sometimes in the cases, the plea of *auterfoits* is spelled *auterfois* or *autrefois*.

[7] The pleas long predated Blackstone in the common law of England. The plea of *auterfoits convict* was noted in *Bradley v. Banks,* 79 Eng. Rep. 243 (K.B. 1611).

oft-cited[8] case of *Rex v. The Duchess of Kingston,* 20 Howell's State Trials 538 (House of Lords, 1776), a criminal case on an indictment for bigamy:

> From a variety of cases relative to judgments being given in evidence in civil suits, these two deductions seem to follow as generally true: First, that the judgment of a court of concurrent jurisdiction directly upon the point, is as a plea, a bar, or as evidence conclusive between the same parties, upon the same matter directly in question in another court; secondly, that the judgment of the court of exclusive jurisdiction directly upon the point, is in like manner conclusive upon the same matter, between the same parties, coming incidentally in question in another court, for a different purpose. But neither the judgment of a concurrent nor exclusive jurisdiction is evidence of any matter which came collaterally in question, though within their jurisdiction, nor of any matter incidentally cognizable, nor of any matter to be inferred from argument.

Thus, the doctrine of *res judicata* was coexistent in the common law along with the doctrines of former acquittal and former conviction. However, the doctrines of *res judicata* and former acquittal and convictions were distinct. It is important that the distinctions be maintained.

It is important to understand the law in Arkansas on *res judicata* in a criminal case as it existed on April 6, 1970. On that date, we had common law regarding *res judicata* that was applicable, and on that date federal law on "collateral estoppel" was made applicable to the States by *Ashe, supra.*

*Ashe* concerned the robbery of the participants in a poker game. It was believed that there were four robbers. Ashe was first tried for the robbery of poker player Donald Knight. The trial court instructed the jury that, if Ashe was found to be one of the participants in the robbery, the theft of any money from Knight would sustain a conviction. Ashe was acquitted. The State then

---

[8] *Rex v. The Duchess of Kingston,* 20 Howell's State Trials 538 (House of Lords, 1776) was most recently cited in *Newman v. State,* 284 Md. 285, 863 A.2d 321 (2004), and has been cited by this court on the issue of *res judicata* in *Falls v. Wright,* 55 Ark. 562, 18 S.W. 1044 (1892); *Peay v. Duncan,* 20 Ark. 85 (1859); *Shall v. Biscoe,* 18 Ark. 142 (1856); *State v. Williams,* 17 Ark. 371 (1856) (civil action on debt); *Trammell v. Thurmond,* 17 Ark. 203 (1856); and in, *Borden v. State,* 11 Ark. 519 (1851) (civil action on debt).

charged, tried, and convicted Ashe of robbery based on the robbery of another poker player. The United States Supreme Court concluded that "the single rationally conceivable issue in dispute before the jury was whether the petitioner (Ashe) had been one of the robbers. And the jury by its verdict found that he had not." *Ashe,* 397 U.S. at 445. The State of Missouri was precluded from trying Ashe in a subsequent trial for robbery of any of the other victims because:

> [o]nce a jury had determined upon conflicting testimony that there was reasonable doubt that petitioner was one of the robbers, the State could not present the same or different identification evidence on a second prosecution for the robbery of Knight in the hope that a different jury might find that evidence more convincing. The situation is constitutionally no different here, even though the second trial related to another victim of the same robbery.

*Ashe,* 397 U.S. at 446. Based on collateral estoppel applied to the States through the Fifth Amendment, the court found that the subsequent prosecution was barred.

In *Ashe,* the court considered the issue of whether "collateral estoppel" or issue-preclusion, as it had been developed under federal common law, was "embodied in the Fifth Amendment guarantee against double jeopardy." *Ashe,* 397 U.S. at 445. The court concluded:

> We do not hesitate to hold that it is. For whatever else that constitutional guarantee may embrace, (citation omitted) it surely protects a man who has been acquitted from having to 'run the gauntlet' a second time. (Citation omitted).

*Id.* This merger by the United States Supreme Court of federal law on the distinct and unrelated doctrines of *res judicata* and double jeopardy has been characterized as a miraculous transformation. *Butler v. State,* 91 Md. App. 515, 526, 605 A.2d 186 (1991). The Maryland Court of Appeals noted that before *Ashe* the court in *Hoag v. New Jersey,* 356 U.S. 464 (1958), noted at the outset of the opinion that double jeopardy did not apply to the case and then in discussing "collateral estoppel" stated:

> Despite its wide employment we entertain grave doubts whether collateral estoppel can be regarded as a constitutional requirement.

*Hoag,* 356 U.S. at 471; *Butler,* 91 Md. App. at 527. We note this not because we doubt the binding authority of *Ashe* on this court to apply the federally developed doctrine of "collateral estoppel" in criminal cases, but rather to point out as the Maryland Court of Appeals so aptly stated:

> The point to be made in recounting this constitutional revisionism is that when two or more distinct bodies of doctrine — stemming from different origins, serving different albeit related purposes, and implemented by different rules — are generically labeled with the same "umbrella term," there arises the recurring semantic danger that a statement in the case law, correct in its original context of one variety of double jeopardy law, may be randomly misapplied to some other variety where it does nothing but generate confusion. This is why any discussion of collateral estoppel should meticulously confine itself to nothing but collateral estoppel cases.

*Butler,* 91 Md. App. at 530–31. The danger of confusion created by the merger of federal law on res judicata and double jeopardy is real.[9] The case of *Brown v. Ohio,* 432 U.S. 161 (1977), followed *Ashe.* In *Brown,* the court noted that in *Ashe,* if all four alleged robberies had been tried in the same proceeding, strict application of the *Blockburger*

---

[9] This danger has been realized in cases such as *United States v. Kills Plenty,* 466 F.2d 240 (8th Cir. 1972), where the Eighth Circuit Court mistakenly included an element of double jeopardy in a case on collateral estoppel and stated:

> The rule of collateral estoppel is 'simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). Thus for collateral estoppel to bar a criminal prosecution, two factors must be present: (1) both adjudicatory entities must be arms of the same sovereign and (2) a factual issue essential to the first verdict must be an essential element of the second charge. In order to prevail in the present case, appellant must persuade the court that (1) the tribal courts and federal district courts are arms of the same sovereign and (2) the question of intoxication, which clearly was resolved in the first trial, is an essential element of involuntary manslaughter. This he has failed to do.

*Kills Plenty,* 466 F.2d at 243. The analysis is internally inconsistent. The court cites *Ashe* for the proposition that "collateral estoppel is 'simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit,' " and then inexplicably adds a requirement that "both adjudicatory entities must be arms of the same sovereign." That law comes out of double jeopardy.

test of double jeopardy would have allowed multiple prosecutions because each robbery was a separate offense. *Brown*, 432 U.S. at 166, fn. 6. However, with regard to "collateral estoppel" the Court in *Brown* did not alter the holding in *Ashe*. Because Ashe was not tried on all four robberies in the same proceeding, "collateral estoppel" precluded asking another jury to decide if he was present at the robbery. *Res judicata* does not apply where the issue is inconsistent verdicts within the same proceeding. *Bridges v. State*, 327 Ark. 392, 938 S.W.2d 561 (1997); *Jordan v. State*, 323 Ark. 628, 631, 917 S.W.2d 164 (1996); *McVay v. State*, 312 Ark. 73, 847 S.W.2d 28 (1993).

In March 1970, less than one month before *Ashe* was decided, this court handed down *Turner v. State*, 248 Ark. 367, 371, 452 S.W.2d 317, 319 (1970)(*plurality opinion*) (*Turner I*), where we stated that "[t]here are no criminal cases in this state relative to the application of *res judicata*, but we have several civil cases, and the principle is, of course, the same. The doctrine of *res judicata*, is discussed in several Arkansas cases." Thus, one month before *Ashe* was handed down by the United States Supreme Court, we noted that our own common law on *res judicata* applied to criminal cases. Previously in *State v. Gill*, 33 Ark. 129, 134 (1878), this court noted the plea of *res judicata* in a criminal case, but rejected it because the matter had not been tried on the merits.

In Turner, Turner was tried for murder and acquitted. The State then charged, tried, and convicted Turner for robbery based on the same facts. Turner asserted *res judicata* in a motion to dismiss. The circuit court denied the motion and an appeal was taken. In *Turner I*, we held that *res judicata* did not apply because the only question determined by the jury was whether Turner committed murder, not whether he committed robbery on that occasion, as alleged in the second criminal action. Turner was charged both with a murder committed in the course of a robbery and premeditated murder with a gun. He was acquitted. However, according to Justice Fogleman's concurring opinion, the record did not contain either the jury verdict form or indicate what evidence was before the jury. Therefore, it was possible that the jury did not decide the issue of robbery. Turner brought another motion to dismiss, but this time he included the record and argued that *Ashe* required that he prevail. In *Turner v. State*, 251 Ark. 499, 473 S.W.2d 904 (1971) (*Turner II*), this court acknowledged *Ashe,* but held that the law of the case precluded the appeal because "collateral estoppel" was considered in the first appeal. However, this

decision was reversed in *Turner v. Arkansas*, 407 U.S. 366 (1972); the United States Supreme Court noted that, had the jury found Turner present at the robbery, a decision of guilt on the murder in the first trial would have been complusory under Arkansas accessory law. Based on this, the court found that the jury in the first trial decided that Turner was not present and that under collateral estoppel, this finding foreclosed the charge of robbery that followed.

In response to *Ashe*, Act 280 of 1975 was passed. *See Journey v. State*, 261 Ark. 259, 547 S.W.2d 433 (1977). Section 5-1-113(2) of the Arkansas Code Annotated provides:

> A former prosecution is an affirmative defense to a subsequent prosecution for a different offense under the following circumstances:
>
> . . .
>
> The former prosecution was terminated by an acquittal or by a final order or judgment for the defendant which has not been set aside, reversed, or vacated and which necessarily required a determination inconsistent with a fact which must be established for conviction of the second offense.

This section is intended to protect the notions of fairness and finality that underlie the decision of *Ashe, supra. Journey, supra.* However, as already noted, Arkansas common law on *res judicata* was applicable in criminal cases even before *Ashe* was decided. It remains applicable.

Mason asserts that "[u]nder the doctrine of collateral estoppel, Mr. Mason's prior acquittal on the charge of possession of a firearm by certain persons prohibits the State from prosecution of Mr. Mason on the charge of battery in the first degree by means of a firearm." The State argues that because the "issues in the prosecution of two offenses were not the same . . . the doctrine of collateral estoppel does not apply."

Since the decision in *Ashe*, both the United States Supreme Court and this court have handed down decisions on *res judicata* in criminal cases. In *Schiro v. Farley*, 510 U.S. 222 (1994), the Court stated that the person who seeks the protection of issue preclusion bears the burden of showing that "issue of ultimate fact has once been determined in his favor." *Schiro*, 510 U.S. at 232 (quoting

*Ashe, supra).* The Court then went on to analyze the case under *Ashe*, stating that it must be determined "whether a rational jury could have grounded its verdict upon an issue other than Schiro's intent to kill." *Id.* Further, the court stated that "to do so, we 'examine the record of a prior proceeding taking into account the pleadings, evidence, charge, and other relevant matter. . . .' " *Schiro*, 510 U.S. at 233 (citing *Ashe, supra*). *See also Dowling v. United States,* 493 U.S. 342 (1990).

■ Development of *res judicata* by the federal courts in criminal cases and made applicable to the states by *Ashe* is similar to the law on *res judicata* as developed in Arkansas and seeks to protect the distinction between *res judicata* and double jeopardy. In *Frank v. Mangum,* 237 U.S. 309, 333-34 (1915), the United States Supreme Court stated:

> It is a fundamental principle of jurisprudence, arising from the very nature of courts of justice and the objects for which they are established, that a question of fact or of law distinctly put in issue and directly determined by a court of competent jurisdiction cannot afterwards be disputed between the same parties . . . The principle is as applicable to the decisions of criminal courts as to those of civil jurisdiction.

In *Frank*, the Court cited to *Southern Pacific Railroad v. U.S.,* 168 U.S. 1, 48-9 (1896), wherein the Court stated:

> A right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, can not be disputed in a subsequent suit between the same parties or their privies; and even if the second suit is for a different cause of action, the right, question or fact, once so determined, must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified.

*Southern Pacific Railroad, supra,* has been cited by this court in the development of our own law on *res judicata. See Pacific Mut. Life Ins. Co. v. Butler,* 192 Ark. 614, 618, 93 S.W.2d 329 (1936); *The Equitable Life Assurance Soc'y v. Bagley,* 192 Ark. 749, 751, 94 S.W.2d 722 (1936).

■ In *United States v. Oppenheimer,* 242 U.S. 85, 88 (1916), in discussing that *res judicata* applied in criminal cases, the Court stated:

> The safeguard provided by the Constitution against the gravest abuses has tended to give the impression that when it did not apply in terms, there was no other principle that could. But the Fifth Amendment was not intended to do away with what in the civil law is a fundamental principle of justice (citation omitted) in order, when a man once has been acquitted on the merits to enable the government to prosecute him a second time.

In *Collins v. Loisel*, 262 U.S. 618 (1923), the Court stated that "the 5th Amendment, in providing against double jeopardy, was not intended to supplant the fundamental principle of *res judicata* in criminal cases." In *United States v. Adams*, 281 U.S. 269 (1930), the Court stated that although a separate offense was alleged, a former judgment established that, at the time the appellant made the complained of entries in the bank books, there was no intent to defraud. Citing *Oppenheimer, supra*, the Court found that the judgment was conclusive on this issue even though this was a different offense. In *Sealfon v. United States*, 332 U.S. 575, 578 (1948), the Court stated that it had long been recognized that the commission of the substantive offense and a conspiracy to commit the same offense are separate and distinct offenses, and that "*res judicata* may be a defense in a second prosecution," noting that the "doctrine applies to criminal as well as civil proceedings . . . and operates to conclude those matters in issue which the verdict determined though the offenses be different." Thus, long before *Ashe, supra*, the United States Supreme Court recognized the importance of *res judicata* in criminal cases, which should be noted in light of the confusion that has arisen since *Ashe* was decided.

The State cites *Sherman v. State*, 326 Ark. 153, 931 S.W.2d 417 (1996), stating; "However, the issues in the prosecution of the two offenses were not the same, and the doctrine of collateral estoppel does not apply." Thus, the State wished to impose the double-jeopardy element of same offense on *res judicata*. Sherman was driving a stolen truck when he attempted to outrun the police, and, in the process, drove through a police roadblock, causing damages to cars, as well as injuries to two persons. He was first charged with four misdemeanors: DWI, failure to yield to an emergency vehicle, driving without a license, and reckless driving. He pled guilty. He was then charged with four felonies: fleeing, first-degree assault, and two counts of first-degree battery. He pled double jeopardy, *res judicata,* and collateral estoppel based on a guilty plea in municipal court. This court analyzed Sherman's double-jeopardy claim under the *Blockburger* test to determine

whether the offenses were the same. The conclusion was that they were not the same offenses. With respect to the claim of "collateral estoppel," this court found that it was not applicable because a factual issue essential to the first verdict was not an essential element of the second charge. *Sherman*, 326 Ark. at 166.

 In criminal cases when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. *Thompson, supra; Hill v. State*, 331 Ark. 312, 962 S.W.2d 762 (1998). The person who seeks the benefit of issue-preclusion bears the burden of showing that: (1) the issue sought to be precluded is the same as that involved in the prior litigation; (2) the issue was actually litigated; (3) the issue was determined by a final and valid judgment; and (4) the determination was essential to the judgment. *In re: Estate of Goston v. Ford Motor Co.*, 320 Ark. 699, 898 S.W.2d 471 (1995); *Crockett & Brown, P.A. v. Wilson*, 314 Ark. 578, 864 S.W.2d 244 (1993).

Because Mason was accused of being a felon in possession of a firearm in the first trial, the elements in that case were proof that he was a felon and that he either had actual or constructive possession of a firearm. *See Banks v. State*, 315 Ark. 666, 869 S.W.2d 700 (1994). In that first trial, Jackie testified that, "Mason pulled up a handgun." He further testified that Mason "held it in his hand, and he shot me with it." He also testified that Mason had the pistol with him outside, and that he hid it behind his back at one point. He also testified that he saw Mason running down the street with the pistol in his hand. Latonia testified that she saw Mason with the pistol in his hand, and that she saw Mason shoot Jackie. Jackie was treated at the hospital for gunshot wounds. The jury was instructed that Mason was charged with the offense of possession of a firearm and that, to sustain that conviction, the State had to prove that Mason was convicted of a felony and that he possessed or owned a firearm. AMI Crim. 7302. The jury found Mason not guilty of "possession of a firearm by certain persons."[10] On November 7, 2002, Mason filed a Motion to Bar Prosecution, arguing that, pursuant to Ark. Code Ann. § 5-1-113(2), and collateral estoppel, his acquittal on the former prosecution for

---

[10] Diane Crutchfield was found murdered a few days after the incidents involved in this case. Therefore, she was not available to testify at either trial, and Mason's theory in the first trial was that Crutchfield had fired the shots.

possession of a firearm barred prosecution for the remaining charges, including battery by means of a firearm. The motion was denied on November 12, 2002. The circuit applied the "*Blockburger* test" and denied the motion. The State then tried Mason on Counts I, II and IV, which included battery in the first degree by means of a firearm. The testimony again was that Mason assaulted the victims with a firearm. The jury was instructed that to sustain the charge, the State had to prove that Mason caused physical injury by means of a firearm.

 The case of *McVay, supra,* is helpful. McVay was tried on DWI and negligent homicide caused by intoxication. The jury found McVay guilty of negligent homicide but not guilty of DWI. McVay argued collateral estoppel and this court correctly stated:

> McVay is correct to this extent: if the state proceeded against him first on DWI and he were acquitted, the state would be collaterally estopped from proceeding against him in a second trial for negligent homicide. *See United States v. Greene,* 497 F.2d 1068 (7th Cir. 1974); *Ashe v. Swenson,* 397 U.S. 436 (1970). We disagree, however, with the corollary — that the same result applies when the two offenses are tried simultaneously.

*McVay,* 312 Ark. at 76, 347 S.W.2d at 30.

 In the present case, the State moved for a continuance to obtain documentation of prior criminal acts by Mason. That meant that the felon in possession of a firearm case was tried first. As a consequence of the acquittal in that case, Mason was able to show at the trial on Counts I, II, and IV that the issue of possession in the second trial was the same issue as that involved in the prior trial, that the issue was actually litigated, and that it was determined in his favor by a final and valid judgment that he did not possess a firearm at the time of the alleged offenses committed with a firearm. The issue preclusion facet of *res judicata* and Ark. Code Ann. § 5-1-113(2) (Repl 1997) precluded the State at the second trial from presenting evidence that Mason possessed a firearm at the time of the crime alleged. This case is affirmed as to the terroristic threatening conviction and reversed and remanded on the first-degree battery by means of a firearm conviction.